[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15707
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-20049-CMA-3


UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross Appellant,

versus

YENKY SANCHEZ,

Defendant-Appellant
Cross Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 17, 2012)

Before TJOFLAT, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Yenky Sanchez appeals his convictions for conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, Count 1; conspiracy to commit health care fraud in connection with authentication features, in violation of 18 U.S.C. § 1028(a)(3) and (f), Count 2; and nine counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), Counts 3 through 9, 11, and 12. Sanchez seeks the reversal of his convictions and a judgment of acquittal on the ground that the evidence was insufficient to convict. Alternatively, he seeks the reversal of his convictions and a new trial on grounds that the District Court abused its discretion (1) in refusing to admit into evidence e-mails from his co-conspirator, Raul Diaz-Perera, because they contained hearsay, (2) in admitting Diaz-Perera's judgment of conviction and a factual proffer (supporting the conviction) during the Government's rebuttal,[1] in violation of his Sixth Amendment right of confrontation, and (3) in denying his motion for new trial based, in part, on Government discovery violations and failure to disclose information purportedly favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Sanchez also contends that improper comments by the

---

[1] Diaz-Perera and Eugenio Ramos Perez, charged as co-conspirators with Sanchez, pled guilty to the conspiracies of which Sanchez was convicted and one of the identify theft charges. The proffer referred to in the text was presented to the court at Diaz-Perera's plea hearing.

2

prosecutor denied him a fair trial.  We affirm.

I.

The Florida Department of Children and Families ("DCF") helps clients obtain public assistance benefits, including Medicare.  DCF maintains a statewide computer dateabase for its clients, which includes their addresses, dates of birth, Social Security numbers, and, if applicable, their Medicare beneficiary numbers ("M-numbers").  The information contained in this database is stored in the FLORIDA database ("FLORIDA").   DCF employs strict security measures to safeguard the personal information it stores in FLORIDA.

Beginning in November 2008 and ending with his arrest on February 23, 2011, Sanchez worked at DCF's Miami call center, answering phone calls from DCF clients across Florida, and had access to DCF's client database in FLORIDA. Between February 2009 and February 2010, Diaz-Perera was Sanchez's supervisor, and they developed a close personal relationship.  DCF terminated Diaz-Perera's employment on October 28, 2010, for poor performance.

In March 2009, Diaz-Perez asked Rebecca Torres Rodriguez ("Torres") if she knew anyone interested in purchasing M-numbers for the purpose of committing Medicare fraud.  She said that she did not, but after she was charged with a criminal offense (not relevant here), she contacted federal law enforcement.

3

Under the supervision of a Postal Inspector, she got Eugenio Ramos Perez ("Ramos") to arrange a meeting with Diaz-Perera. On October 28, 2010, she met with the two men. She told them that she knew an attorney who wanted to purchase 200,000 M-numbers.[2] Diaz-Perera said he could obtain 100-150 M-numbers a day for a fee of $15 for each number. He would receive $9 of the fee, of which he would give $4 to his source at DCF; Torres and Ramos could split the remaining $6.

The Postal Inspector told Torres to ask Diaz-Perera for 150 M-numbers, so they could be tested. She did as instructed, and, on December 15, 2010, Diaz-Perera sold her a list of 148 M-numbers for $1,350. The numbers appeared on seven spreadsheets, with each page divided into seven columns containing all the information Medicare would require for reimbursement—the clients' names, dates of birth, Social Security numbers and M-numbers. Diaz-Perera asked Torres how many more the purchaser wanted, and she said 200,000.

On January 18, 2011, Diaz-Perera, Ramos, and Torres met in the parking lot of a Miami restaurant. Diaz-Perera showed Torres an envelope with the documents inside, and, after a brief conversation, she went to her car to get the

---

[2] Torres wore a recording device and the meeting was videotaped by federal agents and admitted into evidence at Sanchez's trial.

4

money to pay him.  At this point, Diaz-Perera and Ramos were arrested, and the envelop was seized.  It contained forty-four pages of spreadsheets, each with seven columns containing with respect to 1,313 DCF clients the same sort of information the spreadsheets provided on October 28.

Sanchez was arrested on February 23, 2011.  The investigators had discovered via Diaz-Perera's cellphone records that between October 28 and December 15, 2010, Sanchez had a conversation with Diaz-Perera 189 times for over nine hours, and that Sanchez had sent Diaz-Perera 281 text messages. Between December 15 and January 18, 2011, Sanchez sent him 140 text messages. DCF/FLORIDA entries established that Sanchez obtained the M-numbers and the complementary information for all 148 DCF clients listed on the December 15 spreadsheets Diaz-Perera gave Torres, and that Sanchez used FLORIDA to access the information for 437 of the clients listed on the spreadsheets Diaz-Perera brought to the January 18 meeting.

"We review *de novo* whether sufficient evidence supports a conviction, resolving all reasonable inferences in favor of the verdict."  *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010).  When considering a sufficiency challenge, we take the evidence in the light most favorable to the Government and determine whether the jury could have found the defendant guilty based on that

5

evidence. *Id.* Questions of credibility and weight of the evidence are left to the jury, so we affirm when the record provides a reasonable basis for the conviction. *Id.* If disbelieved, "[t]he defendant's own testimony can be considered by the jury as substantive evidence of his guilt."[3] *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008). To affirm the conviction, the evidence does not need to be inconsistent with every theory of innocence. *Id.*

To establish Sanchez's guilt on each of the conspiracy charges, the Government had to prove "(1) that a conspiracy existed; (2) that [Sanchez] knew about the conspiracy; and (3) that [he] knowingly joined the conspiracy." *United States v. Garcia-Bercovich*, 582 F.3d 1234, 1237 (11th Cir. 2009). A defendant's knowing participation in a conspiracy may "be inferred from evidence that the defendant took action that furthered the conspiracy." *United States v. Cooper*, 873 F.2d 269, 272 (11th Cir. 1989). The Government did not have to prove Sanchez's participation by direct evidence, but could rely upon the surrounding circumstances that imply a common purpose and plan. *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001). Such evidence includes "inferences from the conduct of the alleged participants or from circumstantial evidence of a

---

[3] Sanchez testified in his own defense.

6

scheme." *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005) (quotation omitted).

In order to convict Sanchez of aggravated identity theft, the Government had to establish that he: (1) knowingly transferred, possessed, or used; (2) a person's means of identification; (3) without lawful authority; (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c). *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011), *cert. denied*, 131 S.Ct. 1066 (2012). Conspiracy to commit health care fraud in connection with authentication features under 18 U.S.C. § 1028(a)(3) is one of the enumerated felonies in § 1028A(c). 18 U.S.C. § 1028A(c)(4). A "means of identification" includes, *inter alia*, a name, SSN, or date of birth. *Id.* § 1028(d)(7).

The evidence of guilt in this case was overwhelming. Accordingly, it was sufficient to support Sanchez's convictions for conspiracy to commit health care fraud, conspiracy to commit health care fraud in connection with authentication features, and aggravated identity theft.

## II.

Sanchez contends that the District Court abused its discretion in excluding as hearsay out-of-court statements Diaz-Perera made in emails to himself and DCF employees. We review this evidentiary ruling for abuse of discretion. *United*

7

*States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011), *cert. denied*, 132 S.Ct. 2375 (2012).  Even if there was an abuse of discretion, we reverse only if the ruling was not harmless.  *Id.*  "An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights."  *Id.* (alteration and quotation omitted).  We need not reverse a conviction if the evidentiary error "had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict."  *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990).  An error in excluding evidence also is harmless if the content of the evidence was admitted through witness testimony.  *United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 1540 (2011).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  Hearsay generally is not admissible.  Fed. R. Evid. 802.  A "statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).  "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  *Mateos*, 623 F.3d at 1364 (quotation omitted).    The emails contained out-of-court statements, but they were not offered for the truth of

8

their contents and thus did not constitute hearsay.  Although the court was wrong in determining that they were offered for the truth of their contents, in light of the fact that two witnesses involved with the emails testified as to their contents and the overwhelming proof of guilt, the exclusion of the e-mails was harmless.

### III.

Sanchez argues that the District Court abused its discretion and denied him the right of confrontation in admitting into evidence during the Government's rebuttal proof of Diaz-Perera's conviction and the factual predicate presented to the District Court to support it.  While we review a court's evidentiary rulings for abuse of discretion, we review *de novo* a claim that an evidentiary ruling denied the defendant his Sixth Amendment right of confrontation.  *United States v. Gari*, 572 F.3d 1352, 1361 (11th Cir. 2009).

The Sixth Amendment's Confrontation Clause prohibits the admission of testimonial out-of-court statements, except when the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  *United States v. Jiminez*, 564 F.3d 1280, 1286 (11th Cir. 2009).  However, "the Confrontation Clause prohibits only statements that constitute impermissible hearsay."  *Id.* (emphasis omitted).  When the statements are offered for a purpose other than

9

establishing the truth of the matter asserted, the Clause does not prohibit such use. *Id.* at 1286-87.

Confrontation Clause errors are subject to harmless error analysis. *Gari*, 572 F.3d at 1362.  Harmless error occurs when it is "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quotation omitted).

> Federal Rule of Evidence 806 provides, in relevant part:
>
> When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.  The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.

Fed. R. Evid. 806.  The test for Rule 806 "is whether the out-of-court statements would have been admissible for impeachment purposes had the co-conspirator statements been delivered from the witness stand by the co-conspirator himself, not as hearsay about what he said during the conspiracy but as contemporaneous in-court statements." *United States v. Grant*, 256 F.3d 1146, 1154 (11th Cir. 2001).  The objective of admitting inconsistent statements for impeachment purposes is to aid the jury in deciding the witness's credibility, not to show that the statements are true.  *Id.* at 1156.

10

Under Fed. R. Evid. 609, a witness' character for truthfulness can be attacked with a criminal conviction if the conviction entailed one or more years of imprisonment or had an element of the crime being a dishonest act or false statement.  Fed. R. Evid. 609(a).  If the witness is not the defendant, the admission of the conviction is subject to Fed. R. Evid. 403.  Fed. R. Evid. 609(a)(1)(A).  A party may also introduce a witness' prior statement if the witness testifies and is subject to cross-examination, and the statement was given under penalty of perjury at a hearing and is inconsistent with the witness' testimony.  Fed. R. Evid. 801(d)(1)(A).

Regarding disclosures under Fed. R. Crim. P. 16, the rule provides that, at the defendant's request, the Government must allow the defendant to inspect and to copy any papers and documents in the government's possession, custody, or control, and that "the government intends to use . . . in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E)(ii).  Rule 16 permits the Government to present rebuttal evidence without prior notice because the Rule's notice requirements apply only to the government's case-in-chief.  *See United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) (applying the "case-in-chief" language found in Rule 16(a)(1)(G)); *United States v. Windham*, 489 F.2d 1389, 1392 (5th Cir. 1974) ("Rebuttal witnesses are a recognized exception to all witness disclosure

11

requirements."). In addition, "[v]iolations of Rule 16 will result in a reversal of conviction only if such a violation prejudices a defendant's substantial rights." *United States v. Chastain*, 198 F.3d 1338, 1348 (11th Cir. 1999) (quotation omitted).

As an initial matter, because the challenged exhibits—evidence of Diaz-Perera's conviction and the factual predicate supporting it—were offered during rebuttal, the Government was not required to provide notice under Rule 16. Furthermore, because Sanchez, in testifying in his own defense, essentially repeated Diaz-Perera's hearsay statements, the court properly admitted Diaz-Perera's judgment of conviction for impeachment purposes. Because the hearsay statements did not contradict any of Diaz-Perera's statements in the factual proffer he presented to the court in tendering his plea of guilty, however, the court erred in admitting the proffer. This error was harmless, however, given the overwhelming evidence of Sanchez's guilt.

## IV.

Sanchez argues that the Government committed a *Brady* violation by providing an inadequate disclosure regarding Diaz-Perera's contact with Damaris and Cedano and that, given the violation, the court should have granted him a new trial. The day before the trial, the Government disclosed the following

information: "Raul Diaz-Perera contacted Damaris Rodriguez and Maria Cedano, two [DFC] employees who work with hospice care and assisted living facilities, for Social Security and Medicare information regarding nursing home clients. Rodriguez and Cedano did not respond to Diez-Perera." Sanchez claims that this disclosure omitted when the contacts occurred, whether Diaz-Perera personally met with theses employees, and what Diaz-Perera actually told them.

We review *de novo* a District Court's decision whether a *Brady* violation occurred. *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996). A violation occurs when the prosecution suppresses, whether or not in good faith, material evidence favorable to the defendant. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97. To establish a *Brady* violation, the defendant must show that: (1) the Government possessed favorable evidence, including impeachment evidence; (2) the defendant did not possess the evidence, and he could not obtain it himself with any reasonable diligence; (3) the Government suppressed the evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). If the defendant knew of the information or had equal access to it, then there is no suppression issue. *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983); *United States v. Price*, 792 F.2d 994, 998

13

(11th Cir. 1986). When considering whether the non-disclosure of exculpatory information violated a defendant's due process rights, "the focus is not upon the fact of nondisclosure, but upon the impact of the nondisclosure on the jury's verdict." *United States v. Kopituk,* 690 F.2d 1289, 1339 (11th Cir. 1982). Having examined the record, we must conclude that even if the Government's disclosure was insufficient, no violation occurred because Sanchez had equal access to the information at issue: he could have contacted Rodriguez and Cedano and, depending on what they might say, he could have called them as witnesses.

V.

We review the district court's determinations regarding prosecutorial misconduct *de novo* because they involve mixed questions of law and fact. *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997). We subject allegations of prosecutorial misconduct to a "two-part test." *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir. 1990). The test requires us to assess (1) whether the challenged statements were improper, and (2) if so, whether they prejudicially affected the defendant's substantial rights. *Id.* With respect to the first prong, we have held that "[t]he sole purpose of closing argument is to assist the jury in analyzing the evidence." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (quotation omitted). The prosecutor may not "exceed the evidence" during

14

closing argument, but may draw reasonable conclusions from it. *Id.* However, we recognize that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused," and we must determine their probable effect on the jury. *United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir. 1985) (quotation omitted). In addition, the prosecutor may respond to the arguments of defense counsel. *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984). Accordingly, the issues raised by a defendant in his closing argument are "fair game for the prosecution on rebuttal." *Id.*

With respect to the second prong, we have held that "[a] defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998) (quotation and alteration omitted).

"[A] party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned." *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

15

Sanchez argues that three comments made in the prosecutor's rebuttal argument before the jury improperly impugned defense counsel's integrity. We are not persuaded. The prosecutor merely pointed out that the Constitution trusts juries, not the lawyers involved in the case, to decide the defendant's guilt. Moreover, in referring to lawyers, the prosecutor included himself. The second remark Sanchez challenges was a comment the prosecutor made in response to defense counsel's repeated attacks on the quality of the Government's investigation. We have read the remark and conclude that it was in defense of the quality of the investigation and not an attack on defense counsel's integrity. As to the third comment, Sanchez's appellate brief makes no argument as to why it was improper, so Sanchez has abandoned any challenge to the comment. In fine, we find no basis for concluding that the challenged comments prejudiced Sanchez's substantial rights.

## VI.

Finally, we note that the District Court's written judgment contains a scrivener's error about the statute under which Sanchez was convicted, indicating that he was convicted in Count 2 under 18 U.S.C. § 1028A(a)(3) and (f), rather than under 18 U.S.C. § 1028(a)(3) and (f). Therefore, a remand is necessary for

16

the limited purpose of correcting the written judgement to so reflect.  We remand

to the court for the limited purpose of correcting the error.

AFFIRMED, and REMANDED with instructions.